Timothy T. Heaton (10020)
Daniel D. Heaton (8306)
HEATON LAW GROUP
727 N. 1550 E. Ste 400
Orem, Utah 84097
(801) 215-9040
hlg@heatonlawgroup.com
*Attorneys for Plaintiffs*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| PEDRO JOSUE FLOREZ RAMOS, an individual and AMADO ALFONSO ALFONZO MATOREL, an individual; <br><br> Plaintiffs, <br><br> vs. <br><br> ALAN MORTENSEN, an individual; MORTENSEN & MILNE CORP., a Utah domestic corporation; SUZETTE RASMUSSEN, an individual; ALL UTAH LAW PLLC, a Utah professional corporation; CELESTE BORYS, an individual; DOE INDIVIDUALS I-X; and ROE ENTITES I-X; <br><br> Defendants. | **COMPLAINT** <br> **(Tier 3)** <br><br> **JURY DEMANDED** <br><br> Case No. <br><br> Judge: |

Plaintiffs Pedro Josue Florez Ramos and Amado Alfonso Alfonzo Matorel complain and allege against Defendants as follows:

### PARTIES; JURISDICION; VENUE

1.      Plaintiffs Pedro Josue Florez Ramos (hereafter "Pedro Florez" or "Pedro") and Amado Alfonso Alfonzo Matorel (hereafter "Alfonso") are residents of Cartagena, Colombia, but for their

safety and protection, they currently reside temporarily, for an indefinite period of time, at an undisclosed location in an undisclosed country.

2.      Defendant Alan Mortensen ("Mortensen") is a Utah resident who practices law as a principal, employee, and/or agent of Defendant Mortensen & Milne Corp., a Utah domestic corporation with a principal place of business in Salt Lake County, state of Utah.

3.      Defendant Suzette Rasmussen ("Rasmussen") is a Utah resident who practices law as a principal, employee, and/or agent of Defendant All Utah Law PLLC, a Utah professional corporation with a principal place of business in Salt Lake County, state of Utah.

4.      Defendant Celeste Borys ("Borys") is a resident of the state of Utah.

5.      DOE Individuals I-X and ROE Entities I-X are fictitious names of Defendants whose true names and capacities are presently unknown to Plaintiffs, and when and if their true names and capacities are ascertained, Plaintiffs will request leave of the Court to substitute their true names and capacities for their fictitious ones.

6.      Upon information and belief, DOE Individuals and ROE Entities may be liable for damages to Plaintiffs in the capacity of employer or principal, or in the capacity of, and while acting within the scope or performance of, the role of partner, servant, officer, agent, employee, or co-conspirator of one or more of the other Defendants, or some other capacity giving rise to liability under applicable law as determined after further discovery in this matter.

7.      At all relevant times, Defendants, and each of them, were the partner, servant, officer, agent, employee, or co-conspirator of all the other Defendants, and each of them, and were at all relevant times acting within the scope or performance of such partnership, agency, master/servant, or employment relationship.

8.     This Court has subject matter jurisdiction over this action pursuant to Utah Code Ann. §78A-5-102.

9.     This Court is a proper venue for this action pursuant to Utah Code Ann. §78B-3a-201 et seq.

10.     Plaintiffs' damages are such as to qualify this matter as a Tier 3 action as defined by URCP 26(c)(3).

## FACTUAL ALLEGATIONS

### <u>INTRODUCTION</u>

11.     The recent blockbuster film, *Sound of Freedom*, and certain events and individuals on which the movie script was based, provide necessary context for the allegations that follow.

12.     Specifically, in or about 2014, Colombian authorities, with the cooperation and assistance of other agencies and organizations, commenced a sting operation dubbed "Operation Crystal II" for the purpose of investigating a child sex-trafficking organization in Colombia and ultimately obtaining criminal convictions of all culpable parties.

13.     It was this Operation Crystal II that became the subject of *Sound of Freedom*, which yielded over $250,000,000 at the box office and has been seen by over 100 million people worldwide.

14.     Pedro, then 17 years old, was one of the children exploited by the sex traffickers as depicted in the film, and his personal experiences also formed the basis and inspiration for the movie character "Simba."

15.     For reasons explained in more detail to follow, the truth of Pedro's experiences as a victim of child sex trafficking became an obstacle that the Defendants became highly motivated to discredit and undermine, at virtually any cost.

16.    In essence, beginning on or about January 6, 2024 while in the United States, Mortensen, Rasmussen, and Borys, devised a scheme that would come to involve conspiracy, bribery, coercion, defamation, and at a bare minimum, negligence—offenses against either Pedro or Alfonso, or both, that caused them severe emotional distress, mental suffering, death threats, and catastrophic loss of their reputation, their business, their charitable foundation, their home, and their association with family and friends, ultimately requiring Pedro and Alfonso to flee from their home in Cartagena, Colombia and go into hiding where they remain as of the filing of this Complaint.

17.    Pedro and Alfonso therefore file this action to recover the substantial damages they have incurred, which damages the Defendants have proximately caused by engaging in the illicit and tortious acts as pleaded more fully in the sections that follow.  Pedro's history as a victim of child sex trafficking, as well as the events underlying Operation Crystal II, are particularly relevant to the claims alleged against the Defendants in this action.

18.    Pedro's history, as well as a synopsis of certain events giving rise to Operation Crystal II and culminating in the arrests and convictions of those responsible, is therefore summarized in the sections that follow.

19.    Case-related documents, files, and information are available here:

drive.google.com/drive/folders/103Okz9YZiuJUL28qFgnWLNJnZUfSWPMm?usp=sharing

**PEDRO'S HISTORY AS A VICTIM OF CHILD SEXUAL EXPLOITATION**

20.    Pedro was repeatedly anally raped as an 8-year-old boy by his grandmother's neighbor, a 59-year-old carpenter named Silvio. Silvio also forced Pedro to perform oral sex on him and would hit, bite, and cut Pedro.

21.    At 9 years old, Pedro was raped again, this time by a missionary.

22.     By the age of 13 or 14, Pedro was under the control of a street pimp named Willie who managed a group of minor boys and girls and sold them in Cartagena, Colombia's historic center to mostly European and North American foreigners, but also to Arabs and even some native-born Colombians.

23.     Pedro's trafficker, Willie, also held regular swinger events at select homes in Cartagena.

24.      Not only would Willie sell Pedro, but he also regularly sexually abused Pedro himself.

25.     One of Willie's regular customers was a part-time Cartagena resident from Puerto Rico who regularly paid to have sex with Pedro.

26.     This customer wanted Pedro to be a "ladyboy;" specifically, he wanted Pedro to look like a young girl but have a penis.

27.     Willie obliged the customer and began forcing Pedro to take hormone blockers and estrogen to help him present as a girl.

28.     The Puerto Rican customer regularly left money with Pedro's trafficker to pay for Pedro's injections,  hormones, and ladyboy clothes.

29.     Pedro's trafficker re-named Pedro "Sharick Leon."

30.     In the photos included below, the top left photo shows Pedro before his trafficker, Willie, started him on hormone blockers and estrogen. The remaining photos are not chronological.

31.     The bottom row of photos displays an identifiable tattoo on Pedro's stomach that says "Florez." The first three photos in the row show Pedro as a child with the tattoo. The last photo in the row shows Pedro as an adult with the tattoo.



Photos of Pedro as sex-trafficked ladyboy "Sharick Leon."

32.     In 2013, Pedro confided in his neighbor and friend, Davis, about what was happening to him, and Davis connected Pedro to El Instituto Colombiano de Bienestar Familiar ("ICBF") (translation: The Colombian Family Welfare Institute), which offered Pedro an in-house treatment program called RENACER, or "rebirth."

33.     The purpose of RENACER is to help eradicate commercial sexual exploitation and human trafficking of girls, boys, adolescents, and women through programs of care, prevention, and research.

34.     Pedro voluntarily entered RENACER's intensive, specialized therapeutic care on September 3, 2013.

35.     Initially, he lived at RENACER full time and attended school there.  However, after only a couple of months, Pedro fell back into sex trafficking and stopped attending RENACER, although RENACER never formally removed Pedro from the program.

36.     This was Pedro's situation on October 11, 2014, at the time of his involvement in Operation Crystal II.

37.     After Pedro's rescue, he returned to RENACER, where he remained through April 30, 2015 and received all the help, healing, and resources he needed.

38.     Pedro completed the RENACER program and was never trafficked again.

39.     In May 2024, Pedro started an organization called Tejiendo Sueños to help other victims of sex trafficking.



**LA FUNDACION RENACER**

**Nit : 800.230.838-3**

Certifica que **PEDRO JOSUE FLOREZ RAMOS** identificado con C.C. **No.1.143.401.562** de Cartagena, recibió atención terapéutica especializada por encontrase en una situación de vulneración. el cual inicio el 3 de septiembre de 2013 y finalizo el 30 de abril de 2015,

Cabe anotar que la Fundación Renacer tiene como propósito fundamental contribuir a la erradicación de la explotación sexual comercial y la trata de personas en niñas, niños, adolescentes y mujeres, mediante los programas de atención, prevención e investigación.

Para constancia se firma a los veintidós (22) del mes de Febrero de 2024

Atentamente,



**IRINA OLASCUAGA BELTRAN**
**Coordinadora Atención**
**Cel: 3118010838**

Bogotá D. C. Calle 76 Bis no. 20C-51 Barrio San Felipe
Tel (601) 523 17 95
Cartagena, Bolívar Tel: (605) 669 94 30 - 644 77 09
Riohacha, La Guajira Tel: +57 320 577 5158



Pedro first entered RENACER Sept. 3, 2013 and completed the program Apr. 30, 2015

## ORIGIN OF OPERATION CRYSTAL II

40.    In 2014, several private and governmental entities banded together to apprehend a criminal network of child sex traffickers that Colombian officials believed was operating within their borders.

41.    Involved groups included Operation Underground Railroad ("OUR"), Homeland Security Investigations ("HSI"), Colombian Navy, Colombian Migration, Colombian Institute of Family Welfare, and the Colombian police agency Cuerpo Técnico de Investigación, or "CTI," working directly with the Bolívar Regional Prosecutors' Office.

42.    Together, these organizations and governmental agencies planned Operation Crystal II, billed as a "child sex party" to be held on La Coqueta Island near Barú, Colombia on Saturday October 11, 2014.

43.    The events leading up to that day are as follows.

## ENCOUNTER AT PLAYA BLANCA BEACH

44.    A Colombian prosecutor became aware that child sex traffickers were making offers to tourists in certain locations of the Barú Islands.

45.    The prosecutor therefore asked a group of OUR undercover operatives from the United States, including Tim Ballard ("Ballard"), to go to Playa Blanca beach to see if they would be propositioned for sex.

46.    After sitting on the beach for about 20 minutes, a man named "Fuego," later identified as Juan Manuel Oquendo Sierra, approached the OUR operatives saying he could provide girls for sex and asked if they were interested. The conversation went as follows:

| | |
|---|---|
| Ballard: | "Okay, but what exactly?" |
| Fuego: | "Girls, ages 13, 14, 15, 16" |
| Ballard: | "But are they…" |
| Fuego: | "Very beautiful." |

| Ballard: | "But are they experienced?" |
| Fuego: | "They are sweet and experienced." |

47.     Fuego showed the operatives several pictures on his phone of these girls, who clearly appeared to be minors. He also offered the operatives sex with the girls.

48.     Because the operatives had not yet reported back to the prosecutor, they told Fuego that they liked the offer and that they would continue the conversation later.

49.     Ballard introduced his assistant and "friend" to Fuego so Fuego and the friend could exchange numbers and keep in contact.

50.     This "friend" was undercover Colombian police officer Elkin Arnulfo Peña Bernal ("Elkin"), who, with another undercover officer, Yesid Reinaldo Muños Males ("Yesid") and others, became the primary contact points between the traffickers and the OUR operatives.

51.     The officers portrayed themselves as representatives of the American sex tourists (i.e., the OUR operatives). These officers had dealings with the traffickers beyond the involvement of OUR personnel, and they involved OUR only as needed along the way.

## FIRST MEETING BETWEEN OUR OPERATIVES AND TRAFFICKERS

52.     The Playa Blanca encounter with Fuego led to further contacts.

53.     Fuego explained to the officers that he needed the Americans to meet with his "boss," Eduard, who could gather the traffickers together and show the Americans what they had to offer.

54.     This meeting happened within 15 days of their first encounter at Playa Blanca and occurred at the house of Eduard Ortega Issa ("Eduard").

55.     Eduard became the de facto trafficking boss from that point, working directly with officers Elkin and Yesid.

56.     At this meeting, OUR operatives and the traffickers again discussed the sale of child sex, and it was here that the idea of throwing a party was first proposed.

57.    Present at this meeting were Fuego, Eduard, Kely Johana Suarez Moya ("Kely"), and Samuel David Olave Martinez ("Samuel").

58.    All four traffickers described the children they had available to sell, each child described individually. They also showed the operatives pictures of the children on their phones.

59.    Eduard and Samuel had the largest collection of pictures, but all four claimed to have children they would regularly sell for sex, totaling several dozen combined.

60.    One conversation at this meeting went like this:

| | |
|---|---|
| Ballard: | "My friend, Fuego!" |
| Eduard: | "Hello, Thomas." [Speaking to an operative] |
| Kely: | "Hello." [as she shakes Ballard's hand] |
| Ballard: | "What's your name?" [To Kely] |
| Kely: | "Johana." |
| Ballard: | "Jovana?" |
| Kely: | "Johana." |
| Operative1: | "She has a virgin 12-year-old sister. She wants to take her." [Pointing to Kely] |
| Ballard: | "Yes? Really?" |
| Kely: | "She could go." |
| Operative1: | "They are organizing it. They will take a 12-year-old sister." |
| Kely: | "I haven't talked." |
| Operative1: | "I told them $1000 USD." |
| Ballard: | "Or more." |
| Operative1: | "I want to take a good look at her in order to pay $1000 USD." |
| Ballard: | "No, the boss, the American boss, yes, he will pay." |

## SECOND FORMAL MEETING WITH THE TRAFFICKERS

61.    The traffickers arranged another formal meeting with the Americans through officers Yesid and Elkin to further plan the party.

62.    The officers arranged the meeting at a place of their choosing, at a restaurant on the beach in Cartagena.

63.    Fuego, Eduard, Kely, and Samuel were again present, among whom Kely was the only woman.

64.     Again, the traffickers described and showed the operatives pictures of the children they could bring to the party.

65.     The operatives requested that the traffickers bring only those children they had already shown and described to them, using the excuse that they only wanted children under the traffickers' control and did not want any children who may not cooperate or may decide to tell their parents or the police.

66.     The operatives made and continued to reiterate this request to prevent the traffickers from seeking out new recruits for the party.

67.     The traffickers discussed how to treat the young, inexperienced girls:

| | |
|---|---|
| Eduard: | "They are girls who are not very, as they should know, they don't have much experience." |
| Ballard: | "These are girls that aren't super experienced because they are little girls." [Agreeing] |
| Eduard: | "So, try to be, to have a little…" |
| Ballard: | "So try to have a little bit of…" |
| Kely: | "Gentleness." |
| Ballard: | "A little bit delicate with them." |
| Kely: | "Ha, ha, ha, please [said in English]." [while laughing and smiling, then takes a bite of food] |
| Eduard: | "They are innocent kids, and you are the person that will give them that experience." |
| Ballard: | "Okay, gracias. We still have stuff to talk about though." |

68.     The operatives asked if the children would have sex, even the very youngest ones who were eleven and thirteen years old.

69.     Samuel explained that everything was totally clear to all of the children and that all of them would have sex.

70.     When Ballard expressed concern that the children would not sexually perform as expected, Kely nodded with understanding.

71.    Samuel wanted to be very clear and explained that both anal and vaginal sex were fine for any of the children.

72.    When the "Boss" operative asked if he could take pictures and videos of the children while having sex, Kely shook her head no and Eduard said, "No, no, no" while shaking his finger in the air.

73.    Later, Ballard asked if the "Boss" could have "three girls with one man, together in a group." Kely, Eduard, and Fuego all nodded their heads in the affirmative.

74.    The prices discussed at this stage for the virgins in the group was $1,000 USD each, and for non-virgins $250 USD each.

## PLANNING THE PARTY

75.    After this second meeting, Eduard called Officer Elkin and proposed the idea of building a hotel where the traffickers could systematize the selling of children for sex and asked for investment from the operatives.

76.    Eduard explained that the traffickers each normally sold their own collection of children independently but would be willing to pool all their children together for the sake of the hotel proposal. The operatives expressed interest in the idea.

77.    A few days later, with the help of the Colombian prosecutor and many other Colombian authorities, the operatives finalized all of the details for the party with the traffickers, which was to coincide with the birthday celebration of one of the operatives.

78.    The traffickers suggested having the party at the site where they planned to build the child sex trafficking hotel, which would be the perfect spot for a "product testing party," referring to the operatives having sex with the actual children.

79.    The operatives agreed and said they could finalize the hotel plan at the island before the party. This party became the sting operation, Operation Crystal II, referred to above.

80.    To convince the traffickers that the operatives were good-faith customers and had the financial means to fulfill the deal, the operatives fronted all the party costs, showed up early with food and drinks, and used the opportunity to place extensive cameras and microphones for the collection of evidence.

## FACEBOOK INVITE

81.    After planning the party together with the operatives, and with the new prospect of receiving investment for a permanent sex hotel, the traffickers were motivated to show the operatives they had the human capital to fill it.

82.    Consequently, unbeknownst to the operatives and contrary to their express instructions to bring only those children currently under the traffickers' control, the traffickers attempted to expand the number of children at the party by advertising in a local Facebook group.

83.    The operatives did not learn of the existence of this external Facebook invite until long after the party had occurred, at which time they were unable to locate the invite.

84.    Had the operatives known about the Facebook invite, they would have acted to put a stop to it, as the objective of the operation was to rescue those children already known to and under the control of the trafficking network and not to encourage the traffickers to expand their network.

85.    Pedro learned of the party from his neighbor who showed him the Facebook post.

86.    The traffickers advertised it as a beach party with sex on Saturday October 11, 2014.

87.    They offered to pay 1,000,000 Colombian pesos ($500 USD in 2014) to anyone who would have sex with the party planners, and 400,000 Colombian pesos ($200 USD in 2014) to anyone

who merely showed up, which were numbers that the operatives had not previously discussed with the traffickers.

88.    There was no mention of a boat ride or an island in the Facebook post. Pedro did not intend to have sex, but thought the party sounded fun.

89.    Because the operatives had told the traffickers in their planning meetings to bring only the children the traffickers had already shown and described to them, the operatives were surprised when a total of 54 children showed up at the party, which was more than anyone had talked about to that point.

90.    The only people who did not seem surprised by this larger number were the traffickers, who happily told the operatives that they had 54 children to sell for sex that day.

91.    The traffickers were ready to traffic any child that showed up.

## SATURDAY OCTOBER 11, 2014 – THE WHARF

92.    Pedro and his neighbor decided to go to the party together. They took a taxi to the designated place, which was a house in a seedy neighborhood known as "El Educador."

93.    The meeting place was at Samuel's house, and Kely and Eduard were also there.

94.    Pedro already knew Eduard because they both lived in the same neighborhood, but this was the first time Pedro had seen Samuel and Kely.

95.    Samuel, Eduard, and Kely, along with others including two twin brothers, were organizing everyone and giving instructions.

96.    When private service vans or buses arrived, Samuel, Kely, and Eduard helped load the children onto the buses, which traveled around the city picking up children in different locations. The final stop was the wharf.

97.     When the buses arrived at the wharf, Pedro noticed that Kely was organizing the children. She had a notepad out and appeared to be checking names as she loudly directed children onto various boats stationed at the wharf.

98.     Pedro was surprised by this because the Facebook post had said nothing about going anywhere on boats.

99.     At this point, Pedro heard murmurings among the other children that they were going to a private island.

100.    Pedro did not want to get on a boat since he would no longer be free to leave. But the group he had been placed into was being rushed with "Get on, get on quickly!", and his group was funneled onto a boat by the traffickers.

101.    During the boat trip, some of the children began to worry about what was happening and started praying.

102.    All of the operatives had already gone on ahead and were waiting on the island, except for Ballard and Yesid, who were both just watching and keeping an eye on the traffickers as they loaded the children onto boats.

103.    Also, three female operatives stayed behind and went on the boats with the children for their safety.

104.    The women operatives presented themselves as groomers who would prepare the children for their sexual abuse.

105.    Ballard and Yesid then took a separate boat to the island ahead of the traffickers.

106.    The boat trip to La Coqueta Island near Barú, Colombia took about 1.5 hours.

## SATURDAY OCTOBER 11, 2014 – THE PARTY

107.     After arriving at the island and leaving the boats, all 54 of the boys, girls, and adolescents were led down a pier and into a thatched bungalow.

108.     The only adults allowed in the room with the children were the three female "groomer" operatives.

109.     Pedro felt very claustrophobic in such a small space with so many people. The traffickers left some cookies and soda in the room and placed a male guard just outside the door to keep anyone from coming out or going in.

110.     This guard was not one of the operatives. When some of the children opened the door, the guard pushed them back inside and told them to stay there. Many of the children began to cry, including Pedro, but he quickly tried to regain composure.

111.     Kely and the other traffickers then walked about 15 yards away from the bungalow to a table where the operatives were sitting and resumed negotiations. The traffickers sat on one side of the table, and the operatives sat on the other.

112.     After talking for a while, the traffickers wanted to show the operatives a sample of the children. Someone went to the bungalow and called for a group of children, several of them by name.  Pedro would later attend therapy with some of these children.

113.     Before presenting the children to the operatives, Samuel took one girl aside and told her to pretend she was a virgin as virgins command a much higher price. This girl was one of Samuel's personal recruits.

114.     The traffickers then presented the children to the operatives one-by-one, in a line, so they could be individually inspected and interacted with. At the end of the line, each child was brought

before the "Boss," the operative playing the part of the main customer. At least one of the girls was crying during this process.

115.    One of the operatives told the traffickers that the product had to be "offered fresh," meaning the children had to be virgins. One of the traffickers put his hand on the back of a young girl standing next to him, pointed to her with his other hand and said, "She is a virgin, for you."

116.    After the children returned to the bungalow, a girl told Pedro that Samuel had told her two different times to pretend she was a virgin. While crying, she told Pedro she was also on her period.

117.    Pedro knew this girl prior to that day because they had a few common friends and had been trafficked together in another context. The children who had just returned to the bungalow told the others what had just happened. One of the returning girls appeared to go into shock.

118.    Once the children had been returned to their room, Ballard expressed concern that their sexual requirements would not be met. To this, one trafficker responded:

> Trafficker:    "Yours are clear, anal, anal sex, some of the kids have to do what they have to do. Anal and the rest. Whatever you want."
>
> "There are two girls that just got their period, but anal, they'll give it to you."

119.    The traffickers clearly reiterated multiple times the nature of the sex services that would be provided by the children. At one point, a conversation between Ballard and the traffickers proceeded as follows:

> Ballard:    "But one question so that we're all very clear. These little presents, will they have sex? Each one of them?"
>
> Fuego:    "Yes, but…"
>
> Ballard:    "Including the 11-year-old boy?" [In response to which Kely nodded in affirmation]
>
> Eduard:    "Yes, the boy too, but remember to be delicate with them, as you know."
>
> Kely:    "Gentleness."

120.    Once the terms for the product-testing sex party had been negotiated, the traffickers also wanted to finalize the child sex hotel deal:

Samuel:          "Here we have to talk things straight. Here we will be building a legal company, but what we're going to do is illegal."

Fuego:           "They can start working from ages 9-10 so that psychologically they are aware of what they are going to do."

Eduard:          "This is a very open world.'"

121.    When the traffickers were asked what the front for the hotel would be to conceal the hotel's true purpose, Samuel pointed to Eduard and said that Eduard had a modeling agency.

122.    Another man put his hands on Kely's shoulders as Eduard said, "She's a model." Kely smiled. Then Samuel pointed to Kely with both hands and said something unintelligible.

123.    After all the details for the party and the child sex hotel were settled, per agreement, the operatives gave the traffickers a cash down payment for the child sex services.

**<u>SATURDAY OCTOBER 11, 2014 – THE BUST</u>**

124.    With that, the Colombian authorities were notified, and within seconds, police raided the party and detained the traffickers.

125.    One of the traffickers attempted to bribe police:

Trafficker:          "My friend, I have some money for you. Please, let us go. Please!"

Police officer:      "No! I said no!"

Trafficker:          "I'm not with them my friend, please!"

Police officer:      "We have all of this on camera, right? He's offering money."

Trafficker:          "Please my friend. I have money. Help me out, please!"

126.    The police gathered all the adults together, informed them they were all under arrest, and read them their rights. While the arrests were occurring, personnel from the Institute of Family Welfare were caring for the children.

127.    Despite the damning evidence of Kely's guilt already known to police, she tried to convince police she was innocent:

Kely:    "I'm not involved in this sir. I just came for the trip. If you want, I will call my friends."

128.    However, in addition to the video evidence collected at the scene of the party, police also found a notebook in Kely's bag containing details about the party. A page in the notebook read "Trip," followed by the names of 30 people, presumably names of children Kely had procured to sex traffic.



Kely's notebook on the page with "Trip" followed by 30 names.

**KELY'S NOTEBOOK**

129.    The authorities took Kely's notebook into evidence. Before Kely's trial, however, someone with access to the evidence locker ripped the page containing the 30 names out of the notebook, presumably to prevent it from being used as evidence against Kely at trial.

130.    Elkin, one of the Colombian police officers involved in this operation, was later charged with various corruption-related crimes for his conduct as a police officer. Elkin had access to the notebook at various points both before and after he was charged, and coincidentally, was represented by attorney Ariel Olarte, who was also Kely's criminal defense attorney.

## TRAFFICKER CONVICTIONS

131.    After Kely's arrest, along with the others, she was incarcerated in Colombia pending trial but released 18 months later, in 2016, via habeas corpus.

132.    Her trial began the following year or so, but before the conclusion of her case, her judge was removed, setting the process back years.

133.    The prosecution began to move forward again around 2021 or 2022.

134.    The trial occurred in phases until September 2, 2024, when Eduard, Fuego, Kely, and Samuel were all convicted of offenses including "Procurement of Minors for Sexual Exploitation," which reads as follows (as translated):

> Whoever, with the intent of financial gain for oneself or a third party, or to satisfy the sexual desires of another, organizes, facilitates, or participates in any form of carnal commerce or sexual exploitation of a person under 18 years of age shall incur imprisonment from 14 to 25 years and a fine of 67 to 750 times the current legal monthly minimum wage .

> (Article 213 A of the Colombian Penal Code)

135.    Kely violated this statute in multiple ways. She attended three planning meetings for, and was intimately involved in, organizing and facilitating the party on October 11, 2024.

136.    She and the other traffickers each described children they had available to sell for sex at the party and showed pictures of them. Kely even offered up a 12-year-old girl for sex, whom she claimed was her own sister.

137.    Kely suggested the operatives be "gentle" while sexually violating the young girls. On a separate occasion, she again encouraged "gentleness" when an operative was talking about having sex with one of their 11-year-old boys.

138.    Kely also expressed support for the operatives having sex with "three girls with one man, together in a group."

139.    Kely and the other traffickers kept the children in a room against their will and then paraded them before their buyers before accepting a downpayment for the sale of child sex.

140.    Even if no money had been involved, Kely organized and facilitated the sexual gratification of people with minors, trafficking those already under her control and facilitating new recruits through a party designed for that purpose.

141.    Eduard, Fuego, Kely, and Samuel were each sentenced to 232 months (over 19 years) in prison and imposed a fine of 12.3 times the Colombian Monthly Minimum Wage, equal to $3,614.34 US Dollars.

142.    However, because these defendants appeared for their sentencings remotely by video, they could not be immediately taken into custody and quickly absconded.

143.    All of them remain fugitives from justice to this day.

144.    It is of interest that Colombian police officer Elkin also remains a fugitive from justice.

## SOUND OF FREEDOM TOUR – PEDRO IS "SIMBA"

145.    *Sound of Freedom* was released July 4, 2023 in the United States, with a later release date in South America of August 31, 2023.

146.    A South American publicity tour was launched surrounding the release, which included stops in Argentina, Colombia, Venezuela, Ecuador, Peru, Chile, Paraguay, Uruguay, Guatemala, Honduras, El Salvador, Nicaragua, Belize, Panama, and Costa Rica.

147.    Pedro joined Ballard and others on several *Sound of Freedom* tour stops, including Bogota, Colombia (August 11th), Buenos Aires, Argentina (August 17th), Santiago, Chile (August 20th), and Guayaquil, Ecuador (September 7th).

148.    At each of these events, Pedro used his real name but was also clearly introduced as the real-life inspiration for the character "Simba" in the movie.

149.    He was interviewed on stage multiple times as the real-life Simba and identified himself as Simba at all tour stops, in all subsequent interviews, in all media coverage, in conjunction with his real name.

150.    Other media coverage included a Guayaquil TV show and The Last Dispensation podcast by Troy Ables, but there were several others.

151.    It was commonly known that Pedro was "Simba."



Ballard and Pedro third and fourth from the left, respectively.

## PEDRO TO TESTIFY AGAINST KELY IN HER CRIMINAL CASE

152.    Around the time of the *Sound of Freedom* Tour, there began to be more movement in Kely's criminal case.

153.    About six months after the Sound of Freedom Tour, on or about March 6, 2024, the prosecution's case-in-chief against Kely and the other traffickers was scheduled to begin.

154.    Pedro spoke to the prosecutor in preparation for the trial. He was expected to testify near the latter end of the trial, expected to be sometime in August 2024.

155.   Pedro was a direct witness to Kely's presence and organizational involvement for all the events of October 11, 2014.

156.   At Samuel's house, he observed Kely helping to load the buses to transport trafficking victims to the wharf.

157.   At the wharf, he saw Kely organizing the children, checking names, and what appeared to be Kely crossing off names in her notepad.

158.   He watched her loudly direct children onto the boats that took them to the trafficking party.

159.   He saw Kely sitting with the other traffickers at the negotiating table with their "customers" as he was being funneled into a room with 53 other children who, who were prevented from leaving by a guard stationed at the door.

160.   He saw children taken from the room, taken to the negotiating table where Kely was sitting, and then returned to the room.

161.   These children told those who had remained in the guarded room, included Pedro, that they had just been shown to customers who were buying them for sex, including a girl who cried as she recounted that she was told to pretend she was a virgin for the customers.

162.   Another girl appeared to be in shock because of her experience.

163.   Pedro was a witness to all of this.

## LEAD-UP TO THE FEBRUARY 4, 2024 MEETING IN CARTAGENA

164.   By November 28, 2023, the *Sound of Freedom* tour had been over for a couple of months, and Pedro had not spoken to Ballard in several weeks.

165.   Pedro wanted to touch base, so he sent a message to a WhatsApp group containing people connected to Ballard, one of whom was Defendant Borys, a former employee of OUR.

166.   Pedro and Borys had never met, but they knew of each other.

167.    Nobody responded to Pedro initially, but 39 days later on January 6, 2024, Borys, while in the United States, privately wrote to Pedro that she was glad to hear from him.

168.    She told Pedro about a lawsuit she had filed against Ballard, OUR, Angel Studios, which distributed the film *Sound of Freedom*,  among others, and encouraged him to talk to her lawyers.

169.    This shocked Pedro, because not long before this, Borys was on the *Sound of Freedom* tour herself.

170.    At this time, which becomes more evident in connection with allegations to follow, Mortensen and Rasmussen were in the process of securing plaintiffs for litigation against Ballard and others in addition to the action they had already commenced on behalf of Defendant Borys. Kely and Pedro were their two primary targets.

171.    On January 11, 2024, Borys again contacted Pedro from the United States claiming sexual misconduct against Ballard to garner sympathy from Pedro.

172.    She feigned a sudden concern for Pedro after ignoring him for a month and tried to persuade him to talk to her lawyers, Defendants Mortensen and Rasmussen.

173.    She also expressed a saccharine worry for Pedro's association with Ballard, which confused him as he had never experienced any cause for concern.

174.    Two days later, on January 13th, Mortensen, while in the United States, reached out to Pedro asking to meet with him in Cartagena on January 26th.

175.    Still confused, Pedro agreed and was told that Mortensen, Rasmussen, and Borys would all be coming to Cartagena to speak with him.

176.    On January 19th, from the United States, Mortensen proposed that the January 26 meeting take place over breakfast at the Hyatt Hotel in Cartagena, at 9:00 am.

177.    Pedro hoped these visitors might want to financially support his anti-trafficking organization, Tejiendo Sueños, but he was also somewhat leery of them.

178.    To clarify his position, Pedro messaged, "You know that I was rescued by Tim Ballard…I was Simba in the movie *Sound of Freedom*…I am an advocate for the human rights of victims of sexual exploitation and victims of human trafficking."

179.    He added that he felt vulnerable in Colombia, that he was in danger if he stayed there because his traffickers' cases were still pending and they were free to roam, referring to Kely and the other criminal defendants.

180.    On January 22, 2024, while in the United States, Mortensen attempted to persuade Pedro that he was not trafficked at the party on October 11, 2014. Pedro responded, "WHAT??" and strongly reasserted that he had, in fact, been trafficked and called the suggestion that he had not been "slander."

181.    Mortensen, feigning innocence, responded, "Simply reading [stuff] floating around on Twitter. There are so many rumors that we wanted to discuss…."  Pedro replied, "Ok, we can do it. But this is a lie. It took me many years to recover from this … I've suffered a lot."

182.    At this point, Mortensen changed the topic, suggesting Angel Studios and Ballard should have paid Pedro from *Sound of Freedom* profits.

183.    Hearing this reminded Pedro of his funding issues with his foundation, which caused him to re-emphasize that he really needed to leave Colombia, saying to Mortensen, "That's why I am coming to you to see if you can help me move to Spain. A helping hand. I have no one else to ask for help. I don't have … resources for this."

184.    Mortensen replied, "Let's discuss this when we meet on Friday [Jan 26th]. You can use the funds from a lawsuit to immigrate. It would take between one month and two years." Pedro said,

"If you say two years, that's too long for me. I have to leave this year. I thought about moving in the beginning of March."

185.     Mortensen added that if Pedro sued Angel Studios and Ballard, it would be on contingency, so he would not have to pay any attorney fees.

186.     After Mortensen told Pedro more tales about Ballard, Pedro responded, "Before you told me this, I had always seen [Ballard] with different lenses. I always saw him as a hero."

187.     Mortensen, growing more confident, escalated his claims, saying, "The people of the United States feel very offended by Ballard for tricking them into believing he had rescued children from the island. . . . I can't find any proof that you were actually trafficked."

188.     At this claim, Pedro was indignant: "I was absolutely trafficked, and before that I was a victim of sexual abuse and child sexual exploitation."

189.     On January 24th, from the United States, Mortensen rescheduled the in-person meeting to February 4, 2024.

190.     On January 29th, Mortensen and Pedro settled on meeting for breakfast at the Cande Cocina near the Hyatt Hotel at San Diego, Cra 10, Calle de la Serrezuela #No 39-02, Cartagena, Bolivar, Colombia.

191.     On February 2nd, Mortensen texted a photo of the reservation at 9:00am for seven people, including Mortensen, Rasmussen, Borys, and Pedro's family.

## FEBRUARY 4, 2024 MEETING--BREAKFAST AT CANDE COCINA

192.     Pedro, Alfonso, and their two kids arrived at Cande Cocina Restaurant in Cartagena soon after 9:00am where they saw Mortensen, Rasmussen, and Borys seated at a large table.

193.     After ordering, Rasmussen and Mortensen told Pedro that Ballard had been accused of unlawful sexual acts against Borys and seven other women.

194.    They then told Pedro that he had never been trafficked, that if anyone had trafficked him it was Ballard himself, and that Ballard had enriched himself at Pedro's expense.

195.    Because Pedro's acceptance of that version of events would have required him to ignore his own experiences he knew to be true, he asked them, "Are you calling me a liar?"

196.    Pedro said that if Ballard had actually engaged in unlawful conduct, he should be punished, but that he had seen no such evidence.

197.    Pedro said further that he was against any form of sexual violence and that Ballard had taught him how to fight it.

198.    Pedro felt Mortensen and Rasmussen simply wanted him to testify to things he had never seen Ballard do.

199.    Pedro became speechless at what they were asking him to do, so Pedro's husband, Alfonso, spoke up.

200.    Alfonso asked why they were trying to force feed Pedro lies about Ballard that were contrary to Pedro's experiences.

201.    Alfonso expressed that his own observations of what Ballard had done for Pedro were nothing but good, and that they had no desire to sue a man who had only given them knowledge, support, wise counsel, and protection.

202.    At this point, Mortensen revealed a large binder full of documents and opened it face up on the table.

203.    As Mortensen thumbed through the pages, to Pedro's dismay, he saw page after page of intimate details about himself, all of his personal information, as well as everything there was to know about Operation Crystal II.

204.    The binder had his full name, the full names of all his immediate and extended family members, all of their addresses, and both old and new photos of all of them.

205.    Much of what the folder contained could only have been obtained directly from the judge, prosecutor, or defense attorneys in the Operation Crystal II criminal cases, because the folder contained materials that had been sealed by the court for the protection of victims.

206.    Upon information and belief, Mortensen had illicitly received these materials directly from Ariel Olarte, Kely's criminal defense attorney.

207.    Specifically, upon information and belief, Mortensen and Rasmussen were already in talks with Kely by this point and had also established a relationship with Olarte.

208.    Mortensen and Rasmussen, representing Kely, filed a lawsuit against Ballard, Angel Studios, OUR, and others on February 23, 2024, 48 days after Borys's first contact with Pedro, and only one day after Mortensen gave up on trying to convince Pedro to sue Ballard and Angel Studios.

209.    Had Pedro joined as a co-plaintiff in Kely's lawsuit, it would have added a level of credibility to the claims that Kely herself could never bring.

210.    Moreover, had Pedro joined Kely's lawsuit, he likely would have also been a star witness in Kely's defense at her upcoming criminal trial beginning March 6, 2024, just 12 days after her lawsuit was filed, thus saving Kely from a likely prison sentence and handing Ariel Olarte victory and fame in a high-profile case.

211.    And for obvious reasons, a defense verdict for Kely in her criminal trial was crucial to the viability of Kely's civil lawsuit against Ballard et al. alleging that no child sex trafficking ever took place, from which Mortensen and Rasmussen stand to earn substantial fees upon a favorable verdict.

212.    Upon information and belief, Mortensen, Rasmussen, and Borys, knowing from communications on January 22nd that Pedro already felt vulnerable and in danger in Colombia, together conspired, while in the United States, to compile this privacy-invading dossier on Pedro for the express purpose of stoking fear and terror to induce him to either join Kely's lawsuit, or to coerce him not to testify against her in her trial beginning March 6, 2024.

213.    The scheme had the desired effect. Pedro was terrified. He knew that if that information should fall into the wrong hands, it would enable his enemies to find him or to have leverage and power over him, which brought him severe emotional distress and mental suffering.

214.    Pedro demanded to know how they had obtained these documents, as only select court personnel should ever have access to them, to which they responded with stumbling incoherence.

215.    Finally, one of them lied, "Anyone can get it."

216.    After talking further, Mortensen and the others realized Pedro was not going to budge, even after their coercive intimidation attempt.

217.    At this point, Mortensen asked what Pedro's family needed. Pedro replied as he had in his text messages leading up to this meeting. He said they were not safe in Colombia and needed to go to another country.

218.    They asked if Pedro would be willing to sue Angel Studios for using his story without compensation. If so, Pedro could have the means to leave Colombia in peace.

219.    At this, Pedro's husband, Alfonso, was livid, saying they would not be suing Angel Studios either. They fully supported the movie as a powerful tool against child trafficking.

220.    In the days leading up to this meeting, Mortensen had tried to convince Pedro that Ballard had sold Pedro's story in book form for money without permission.

221.    At the meeting, Mortensen was now claiming that Pedro's story had been sold without authorization in five different books, all without evidence—no titles, authors, photos or descriptions.

222.    Alfonso said that if the book claims were true, perhaps Pedro would sue the publishing companies. They have waited and repeatedly asked Mortensen for evidence, which he has never provided.

223.    Finally, Rasmussen and Mortensen presented a document written in Spanish for Pedro to sign, but it was full of inaccuracies about Pedro and Operation Crystal II.

224.    Despite Pedro's numerous, clear, and forceful prior assertions that he was indeed a victim of sexual exploitation prior to Operation Crystal II, Mortensen and Rasmussen wanted Pedro to sign a statement saying that he was not.

225.    In fact, upon information and belief, being privy to Kely's Colombian court records and proceedings and the substantial video, audio, and testimonial evidence incriminating Kely, Mortensen and Rasmussen already knew or should have known beyond a reasonable doubt that the children at the sex party on October 11, 2014, including Pedro, had been trafficked.

226.    Mortensen and Rasmussen became visibly upset at Pedro's refusal to cooperate.

227.    Alfonso then stated that he was tired of hearing from the attorneys and wanted to hear directly from Borys instead.

228.    Speaking in English, Borys made sexual accusations against Ballard with Rasmussen translating into Spanish.

229.    Pedro found this difficult to believe given how recently Borys had been willing and excited to accompany Ballard on operations and work-related trips as his "right hand."

230.    It seemed evident to Pedro and Alfonso that when Rasmussen and Mortensen approached Borys with a potentially lucrative lawsuit, Borys agreed to cooperate just as Kely did, and just as they had hoped Pedro would.

231.    Upon information and belief, Borys knew that Pedro knew she was lying, and it made her uncomfortable enough that she had to stand up from the table and leave.

232.    Rasmussen followed her and Mortensen made up the excuse that Borys was feeling sick and traumatized.

233.    However, Rasmussen and Borys did not go to the bathroom. They huddled some distance off and continued talking in earnest.

234.    When they returned, Mortensen paid the bill with a credit card and then left.

235.    Before he left, however, he said that he wanted to meet again for lunch at 2:00pm.

236.    Everyone agreed to meet at La Tinaja restaurant at Cra. 10 #10-36, La Matuna, Cartagena de Indias, Provincia de Cartagena, Bolívar.

## FEBRUARY 4, 2024 MEETING: LUNCH AT LA TINAJA

237.    Pedro and Alfonso arrived at La Tinaja a little before 2:00pm. Mortensen showed up about 30 minutes late. He looked extremely nervous and said that Rasmussen and Borys could not come because Borys was sick to her stomach.

238.    Pedro, Alfonso, and Mortensen were the only ones who attended the meeting.

239.    Mortensen received his plate of food but seemed too nervous to eat any of it. He just picked at it.

240.    Mortensen brought up suing Ballard again and asked what Pedro and Alfonso needed and wanted as a family. As Pedro had reiterated over several days, and again that morning, he said that

what they needed was to leave Colombia so they could escape dangers and have peace. Pedro suggested Spain as a destination.

241.    Mortensen then said, "How much do you need?" Pedro told him, "Between $5,000 to $8,000 U.S. dollars." Mortensen replied that money was not a problem for him and he would give Pedro $8,000 U.S., but only if he sued Ballard.

242.    Alfonso played along, saying, "Okay, give us the money and we will move to Spain and sue Tim Ballard."

243.    Pedro and Alfonso were never planning to take the money, but when Mortensen was so brazenly offering it, they decided to see how far Mortensen would go in the furtherance of the scheme he had orchestrated with Rasmussen and Borys.

244.    Mortensen again said that although he had no problem giving them the money, the problem for him was how to give it to them. He explained that he could not send it to any bank account associated with Pedro or Alfonso because after they filed the lawsuit, Ballard would have the ability to investigate and would realize Mortensen had paid them.

245.    He said that if he were caught doing that, he could lose his law license. When he said that, he became even more nervous and looked around the restaurant. He looked as though he was about to cry and was sweating profusely.

246.    Pedro asked him why he was so nervous. He responded that it was not easy for him to be sitting with such a legend as Pedro, which surprised Pedro and struck him as rather odd, especially since he had recently called Pedro either a dupe or a liar.

247.    Pedro looked over at Alfonso, who also looked surprised. Alfonso and Pedro exchanged a knowing glance that Mortensen was trying to distract from his nervousness with playful flattery.

248.    Mortensen then said he needed to call his daughter who was an immigration attorney to ask for advice on how Pedro could successfully emigrate to Spain. She answered and he spoke to her for a few minutes in English.

249.    After that, Mortensen pulled out a new document for Pedro to sign with changes made from the one Mortensen had asked Pedro to sign that morning.

250.    What Mortensen seemed most interested in was having Pedro acknowledge that he had never met Kely before the day of the party and that to his knowledge she had not invited him to the party.

251.    Pedro signed it.

252.    When Mortensen later produced the document publicly, it was in English, not Spanish, but still had Pedro's signature. They had transferred his signature without permission.

253.    Because Pedro did not receive a copy until much later, he is not even sure if the document presented to the public was the same document that he signed.

254.    After Pedro signed the document, Mortensen paid for the meals with his credit card. Before Mortensen left, he told Pedro that he would return in two weeks with the $8,000 cash for their emigration to Spain and would have a copy of the lawsuit against Ballard for them to sign.

255.    Now that the scheme devised by Rasmussen, Mortensen, and Borys was on full display, Pedro put an end to it. He told Mortensen that he would never sue Ballard for any amount of money.

256.    Hearing that, Mortensen got up and left the restaurant in an extremely nervous fashion, looking around the restaurant as if someone was spying on him.

257.    Pedro has not seen Mortensen, Rasmussen, or Borys since that day.

**FOLLOWING UP AFTER THE FEBRUARY 4, 2024 MEETING**

258.     Mortensen claimed at breakfast on February 4, 2024 that at least five books had been published containing Pedro's personal story without his permission, including one written by Ballard. But after repeated requests, as of February 23, 2024, Mortensen could still produce no evidence.

259.     Mortensen, apparently realizing that convincing Pedro to join in Kely's lawsuit against Ballard et al. was a lost cause, filed the complaint on February 23, 2024 (the "Kely Complaint").

260.     In the Kely Complaint, drafted and filed in the United States, Mortensen and Rasmussen gratuitously and intentionally included the full names of Pedro's father and mother and what city they lived in. They also stated that Pedro lived with them as of October 11, 2014.

261.     Six days after the Kely Complaint was filed, on February 29, 2024, an account on X called "Suarez Kely" with the handle @ParontoOf clipped and re-posted this same private information from the Kely Complaint.

262.     That X account is not controlled by Kely; rather it is controlled by a man named Frederic Slice ("Slice"). The account speaks of Kely only in the 3rd person, and when speaking in the first person refers to Slice himself, his activities, his politics, and his Texas town. All of the topics his account posts about (besides Kely) pertain to U.S. politics and issues.

263.     Slice has also created a Facebook account for Kely, showing her picture, but with the name, "Slice H Frederick (Charlie)." Further, the IP address associated with Slice's X posts originates from Texas.

264.     Slice has ties to Lynn Packer, a long-time vocal critic of Ballard and OUR.

265.     The webpage tied to the "Suarez Kely" X account belongs to Lynn Packer ("Packer"): https://www.youtube.com/@lynnkennethpacker8389.

266.    Upon information and belief, Mortensen and Rasmussen, knowing of Pedro's fear, coordinated with Slice to publish details, questions, and propaganda on the X platform that are advantageous to Kely, in addition to re-publishing the names of Pedro's parents and their city of residence.

267.    The revelation of Pedro's parents' full names made it far easier for anyone, including cartels and sicarios, to find him.

268.    Pedro's parents' names and city were not known to the public, and he had taken reasonable steps to keep them private. Given Pedro's dangerous situation, it was highly offensive to Pedro, and would be to any reasonable person, that this information was released, due to its significant likelihood to cause great mental suffering to an ordinary person. Pedro's parents' names and city were not of sufficient legitimate public interest to justify the revelation.

## TIM BALLARD LATIN AMERICA TOUR

269.    Ballard planned the Tim Ballard Latin America Tour for the summer of 2024, which began in the middle of Kely's trial proceedings.

270.    The tour was planned to pass through Argentina, Chile, and Ecuador to educate parents about the child sex trade, including information on prevention and aftercare.

271.    Pedro again joined Ballard as a special guest on this tour to describe his story and his personal aftercare. Pedro was invited to join as an articulate and passionate opponent of the child sex trade.

272.    The first day of the tour was Monday July 15, 2024 at Cuenca, Ecuador's largest venue, the Theater of the Arts. Earlier that day, around noon, representatives of the tour met with relevant leaders of the Ecuadorian province, Azuay, at Teatro Pumapungo, so they could spread the message.

273.    During this afternoon meeting, one of the producers noticed that two white Americans, "gringos," were sitting together in the meeting busily taking notes. The producer thought every aspect of this was very strange and expressed how strange it was that two gringos were in Cuenca, Ecuador, let alone in this obscure location, busily taking notes.

274.    A producer directed the photographer at the meeting to take their picture, but every time he tried, the men covered their faces, which enhanced suspicions.

275.    After the meeting, due to the presence of these strange men, tour personnel asked the provincial government for an escort back to their hotel for safety, and again to the venue later that night.

276.    Prior to the evening event, a copy of the picture of these men was given to tour personnel, and they were told to notify the producer if the men showed up again, which they did, about 30 minutes before the start of the event.

277.    This time, police approached the men, and upon inspecting their IDs discovered they were from Utah. Finding them suspicious, the police removed them as a safety precaution. It was later discovered both men were private investigators in Utah: Alexander Glen Fisher and Martin G. Hurlburt.

278.    The Cuenca event ended about 11:00pm. The next morning, July 16, 2024, everyone associated with the tour started back to their homes. Pedro took a taxi to Guayaquil, Ecuador, and then a flight on to Cartagena, Colombia on July 17th where he arrived mid-afternoon.

## THE EL UNIVERSAL BROADCAST AND RESULTING THREATS TO PEDRO

279.    July 15, 2024, the date of the Cuenca, Ecuador tour stop of the Tim Ballard Latin American Tour also happened to be the first day of the defense team's case in chief in Kely's criminal trial. If Kely were convicted, it would likely destroy her case against Ballard et al.

280.    To prevent this, Mortensen and Rasmussen flew to Colombia to bolster Kely's case by spreading useful falsehoods on the El Universal news network.

281.    This is presumably why Mortensen and Rasmussen had hired two Utah private investigators to spy on Ballard, Pedro, and others in Ecuador. They were apparently looking for anything to help Kely's case.

282.    Their efforts failed. Kely was convicted less than two months later.

283.    The day after Kely's conviction, Mortensen organized a Go Fund Me in a desperate attempt to rehabilitate his convicted plaintiff on appeal. One of the first of only a few donations was $1,000 from Michael Borys, the husband of Defendant Celeste Borys.

284.    Mortensen's El Universal interview aired on July 17, 2024, the night Pedro arrived back in Cartagena, Colombia after the tour stop in Cuenca, Ecuador. Around 8:00pm, a friend told Pedro that El Universal had just posted a news segment about him. The viral report included interviews with Mortensen, Rasmussen, Kely, and Kely's attorney about Operation Crystal II, Pedro, and others. As Mortensen and Rasmussen sat together for El Universal's interview, Mortensen said the following as Rasmussen nodded along in agreement:

> **Nobody was trafficked**…[W]e had a guy from here who was 17 years old and he went to [the] party…He was afraid because the police had arrived and did not know what was going on. **He was never trafficked before**. But then, he realized there was an advantage. So **he decided to be "Simba"** in the movie. **He signed a declaration stating that he was never trafficked**. He was only scared because of the police at the scene. Not the actors going as undercover traffickers.

> The irony of all this is that Tim Ballard is the trafficker.

(Emphasis added.)

285.    Every part of Mortensen's above statement is false. Minor children had been trafficked by Kely and the others at the party. The perpetrators were convicted.

286.    Pedro had been trafficked for years before the party. He had even been in RENACER's therapy and recovery program for victims of sex trafficking just months before the party.

287.    Immediately after the sex party, Pedro returned to recovery and stayed through completion on April 30, 2015. Notably, Mortensen's own phone has numerous messages from Pedro telling him over and over again that he was trafficked before October 11, 2014 as well as on that day.

288.    Pedro did not just "decide" to be "Simba" for convenience. He didn't choose it for himself. Others told him he was the inspiration for the character, and the facts fit. As for Ballard being a trafficker, this is easily disproven, especially by the undercover videos of the operation.

289.    Contrary to Mortensen's statement that he has a "signed a declaration stating that [Pedro] was never trafficked," the document reads that "[a]fter feeling the horrors of being trafficked on October 11, 2014, I decided to start an aftercare program for sex trafficking survivors called Weaving Dreams."

19. After feeling the horrors of being trafficked on October 11, 2014, I decided to start an aftercare program for sex trafficking survivors called Weaving Dreams.

20. Tejiendo Sueños has worked hand in hand with and with the support of Operation Underground Railroad.

21. Operation Underground Raikoad sent grants for my care programs postenores.

23. Me retrataron as Simba in the movie Sound of Freedom. ero 2024.

_____ dia de febj

Pedro Flores Ramos

290.    Mortensen's lies in El Universal's viral news segment brought heavy consequences upon Pedro. That same night, a stranger messaged Pedro on Facebook accusing him of giving false testimony. The next day, July 18, 2024 at 12:21pm, a Facebook account called "Libertad" (libertad.647965) messaged Pedro:

> Continue believing that you'll get away with it; all the money those Americans have given you, you'll return to me double. Look for a good lawyer because you won't

get out of this one. **Liar, don't let us see you, or you'll get lead up your ass**, you damn coward.

What legal sanctions can defamation have in Colombia?" [Then he quotes portions of the legal code to Pedro]

291.    Pedro's next hate mail came from another stranger, Farid Jimenez, only 15 minutes later:

Keep believing, dear, what you can't imagine is the huge reprimand that's coming your way. **Fraudulent liar, selling yourself for a few bucks.** Between heaven and earth, there is nothing hidden. . . .

(Emphasis added.)

292.    Around this time, a neighbor told Pedro that four men on two motorcycles were riding around the neighborhood of his father's house looking for him. Pedro did not live at his father's house, but his father's house was a 5-minute walk away.

293.    The men were unfamiliar, rough-looking, had mean faces, and wore caps and sweatshirts. Pedro had no friends who rode motorcycles. Locals have come to associate this kind of look and behavior with "sicarios," or hired assassins, which is what Pedro's neighbor thought they were.

294.    That evening, Pedro received another message from Emilio Perez:

[T]ry to tell the Americans from whom you've received good money to get you a lawyer. **How did you sell yourself like that? Knowing it was all a farce.** Poor you!!"

(Emphasis added.)

295.    Even prior to these terrifying threats and messages, Pedro and the prosecutor had already agreed that Pedro would not testify in Kely's trial after all. Pedro had been afraid to, and the prosecutor agreed that Pedro had already been through enough without having to re-victimize him on the stand in court. In light of the fall-out from the El Universal news segment, this was a prescient decision.

## PEDRO FLEES FROM CARTAGENA

296.    In the midst of these threats, on July 18, 2024, Pedro first learned that an X account named "Suarez Kelly" had posted his parents' full names and city of residence. This revelation, coupled with the attention Pedro was getting from the recent El Universal news segment, only enhanced Pedro's fear. The revelation of Pedro's parents' names in Kely's Complaint, and now in the X post, made it easy for anyone to find him, including the sicarios on motorcycles driving around his father's neighborhood looking for him.

297.    Pedro knew he was in danger before, but now he needed to get his family out of Cartagena as soon as possible. He immediately packed two small bags for his family and bought plane tickets to fly from Cartagena to Bogotá, Colombia later that night.

298.    At around 4pm, before his flight, Pedro made a video documenting the danger he was in to let the public know who was responsible if anything bad should happen to him.

> I'm Pedro Florez. I'm from Cartagena, and I'm making this video so that **if something happens to me at some point, I hold three people responsible: Alan Mortensen, Suzette [Rasmussen], [and] Celeste Borys**, North Americans from the city [sic] of Utah. **These people contacted me and came here on February 4 [2024] to meet with me so that I would sell myself as a witness for them** to file a lawsuit against Angel Studios, Operation Underground Railroad, and Tim Ballard, a situation that didn't allow access to them, and **they offered me a certain amount of money to do it. So you know if something were to happen to me, here is this video**.

(Emphasis added.)

299.    Pedro had arranged a police escort from his safe house to the airport, but the police were late, so Pedro found his own way to the airport. When he arrived in Bogotá around 11:30pm, he got an Airbnb under a pseudonym where he stayed for several days.

300.    During this time, Pedro realized that Mortensen, Rasmussen, and Borys were emboldened because their deeds had never been brought to light. He wondered what else they would do if they were willing to bribe, threaten, and lie.

301.    Pedro decided to report to the authorities everything they had done to him on February 4, 2024 in Cartagena.  On July 18th, Pedro began organizing enough information to file a police report by July 24, 2024.

302.    After the Airbnb, Pedro found two different safe houses in Bogotá, which he switched between for almost two months. But with threats continuing to mount, he knew he had to leave Colombia completely.

303.    During Pedro's stay in Bogotá, Kely and the other traffickers were convicted on September 2, 2024. Ten days later, Pedro flew from Bogotá to Mexico City on September 12, 2024 where he and his family stayed while preparations were made for them to cross into the U.S.

304.    Pedro flew with his family from Mexico City to Tijuana on the evening of October 4, 2023. They picked up a rental car at the Budget Rental Car located at the Hampton Inn next to the airport.

305.    On their way to an Airbnb in Rosarito, Pedro, Alfonso, and their daughter stopped at an OXXO convenience store to get water for their daughter. They were only in the store for a few seconds, but in that very brief time, someone had smashed out the windows of their car and had stolen a small bag containing all of their passports as well as Pedro's U.S. Visa and Colombian ID card. Everything else was ignored.



Pedro's car window smashed and all travel documents stolen.

306.    Pedro had been followed from Bogotá, and his pursuers had grown desperate since the U.S. border was now less than an hour away. The thieves had taken their travel documents in an apparent attempt to prevent them from reaching the United States.

307.    As of this filing, Pedro and his family remain hidden in an undisclosed location.

## THE COSTS OF HIDING

308.    Being forced to leave his home in Cartagena and go into hiding in a foreign country has brought great hardship to Pedro and his family. Their high-end salon business and livelihood have been destroyed. Tejiendo Sueños, their charitable foundation to help victims of sex trafficking, has shuttered. Pedro has lost the companionship and association of friends and family.

309.    Most tragically, for the safety of their family, Pedro and Alfonso were forced to leave their only son, Pierre, behind. While not a biological son, Pierre is Alfonso's nephew, whom Pedro and Alfonso have raised since birth. Because of this unusual arrangement, Pedro lacked the necessary documents to bring Pierre out of the country, forcing them to make the excruciating decision to leave Pierre behind with another family member.

310.    Both parents and child have suffered immeasurably since their separation. On November 8, 2024, young Pierre missed his parents so much that he decided to go looking for them and got lost. Pierre's caretakers called the police and searched for him everywhere. Pedro sent out an emergency missing child message to several contacts in Cartagena. They eventually found him in a distant and dangerous neighborhood with one shoe missing. He was crying when he told the police that he was just trying to find his parents.

  

  

Pedro and Alfonso's son they were forced to leave in Colombia.

## FIRST CLAIM FOR RELIEF
## CIVIL CONSPIRACY
### (As to Pedro and all Defendants)

311.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

312.    Defendants comprise two or more persons acting in concert who agreed and conspired, coming to a meeting of the minds, on an unlawful course of action to harm Pedro by attempting to induce Pedro to retract and repudiate his prior statements regarding having been sexually trafficked as a minor on October 11, 2014 and prior, to thereby undermine the criminal prosecution of Kely

in Colombia and strengthen her credibility as plaintiff in the Kely Complaint, and to join with Kely as co-plaintiff in the same action.

313.    Defendants engaged in one or more unlawful, overt acts to accomplish their objectives, as follows:

(a) Defendants, knowing of the danger that Pedro faced as a potential witness against Kely and knowing of Pedro's fears and anxieties regarding his safety and the safety of his family, attempted to extort Pedro into complying with their demands by (i) unlawfully acquiring private information regarding Pedro and his family, under seal by court order, (ii) showing Pedro a binder containing the private, court-sealed information, implying that the information could be released publicly if Pedro failed to cooperate and join in the Kely Complaint, thereby inducing significant fear and emotional distress in both Pedro and Alfonso, and (iii) ultimately releasing certain private information causing Pedro and Alfonso to flee Colombia for their safety and protection.

(b) Defendants, knowing that their statements to Pedro that his personal story had been published in five different books were false, intentionally lied to Pedro for the purpose of fraudulently inducing Pedro to seek recompense by joining with Kely as a plaintiff in the upcoming Kely Complaint.

(c) When all other tactics failed, Defendants finally attempted to bribe Pedro by offering him money for the purpose of influencing and inducing him to recant his testimony and join with Kely in the upcoming Kely Complaint.

314.    Because Pedro did not yield to the Defendants' scheme, Defendants, as co-conspirators engaged in further wrongful conduct as pleaded in the claims for relief that follow.

315.    Defendants' conspiracy and commission of the foregoing overt and unlawful acts were the direct and proximate cause of significant damages to the Plaintiffs, including, without limitation, economic damages, damage to reputation, and severe emotional distress.

316.    Moreover, Pedro seeks punitive damages arising from Defendants' willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, Pedro's rights.

## SECOND CLAIM FOR RELIEF
## DEFAMATION
### (As to Pedro and Defendants Mortensen and Rasmussen)

317.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

318.    Defendants Mortensen and Rasmussen published false statements regarding Pedro during Mortensen's El Universal interview, which aired publicly on July 17, 2024.

319.    Specifically, Mortensen's statements that (i) "Nobody was trafficked," that (ii) Pedro "was never trafficked before" but realizing an advantage he "decided to be Simba in the movie," and that (iii) Pedro "signed a declaration stating that he was never trafficked," are each demonstrably false. Rasmussen ratified each of the statements by appearing with Mortensen and nodding affirmatively as Mortensen spoke.

320.    Mortensen did not mention Pedro by name during the El Universal interview.

321.    Notwithstanding, Mortensen made each of the false statements in reference to the person who was "Simba" in the movie *Sound of Freedom,* and Pedro was explicitly known far and wide as the person on whom the Simba character was based.

322.    More particularly, Pedro had participated in the *Sound of Freedom* promotional tour, traveling to numerous countries, and being identified by his true name, was introduced as the inspiration for the movie character Simba.

323.    In addition, Pedro was interviewed on stage multiple times as the real-life Simba and identified himself as Simba at all tour stops, in all subsequent interviews, and in broadcast media, podcast, and radio coverage.

324.    Defendants' publication of the false statements regarding Pedro was made with actual malice as Defendants, being privy to the overwhelming video, audio, and testimonial evidence collected during Operation Crystal II, knew that child sex trafficking had actually taken place.

325.    Defendants also knew that Pedro had been a sex-trafficking victim prior to Operation Crystal II.

326.    Finally, Defendants' statement that Pedro had signed a declaration stating that he had never been trafficked was a lie.

327.    Defendants' knew they were lying, in sufficient part, because the document Pedro signed and which they possessed stated the opposite.

328.    Defendants' publication of false statements regarding Pedro was the direct and proximate cause of substantial damages to Pedro including, without limitation, economic damages, damage to reputation, and severe emotional distress.

329.    Moreover, Pedro seeks punitive damages arising from Defendants' willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, Pedro's rights.

**THIRD CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(As to all Plaintiffs and all Defendants)**

330.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

331.    Defendants' conduct toward Plaintiffs was extreme and outrageous, going beyond all bounds of decency, and was intended to and did cause Plaintiffs severe emotional distress.

332.    This conduct includes, but is not limited to, malicious public statements, invasion of privacy, and concerted efforts to destroy Plaintiffs' personal and professional life.

333.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered severe mental anguish, anxiety, depression and other damages, including loss of their business, and lost wages due to the inability to work.

334.    Moreover, Pedro seeks punitive damages arising from Defendants' willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and a disregard of, Pedro's rights.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (As to all Plaintiffs and Defendants Mortensen and Rasmussen)

335.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

336.    Alternatively, Defendants negligently caused emotional distress to Pedro and Alfonso.

337.    Mortensen and Rasmussen should have known that Mortensen's public statements during the El Universal interview, as Rasmussen sat idly by and nodding in agreement, that "nobody was trafficked" and that the person who "decided to be Simba" had "signed a declaration stating that he was never trafficked," involved an unreasonable risk of causing significant emotional distress and damages to both Pedro and Alfonso.

338.    In particular, the nature of the Colombian criminal proceedings against the Operation Crystal II sex traffickers and the dangers that the criminal defendants and their sympathizers, in addition to others who may be led to believe that Pedro had lied, were well known to Mortensen and Rasmussen.

339.    They each knew, or should have known, that the El Universal interview statements could lead to exactly what transpired: threats so significant and imminent that Pedro and Alfonso were forced to flee their home, suffering severe emotional distress and illness in the process.

340.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered severe mental anguish, anxiety, depression and other damages, including loss of their business, and lost wages due to the inability to work.

## FIFTH CLAIM FOR RELIEF
## NEGLIGENCE
### (As to all Plaintiffs and Defendants Mortensen and Rasmussen)

341.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

342.    Defendants Mortensen and Rasmussen owed Pedro and Alfonso a general duty of care.

343.    Moreover, as Mortensen and Rasmussen approached Pedro and Alfonso as a potential client, they had a heightened duty to act ethically and with reasonable care considering the full scope of all information provided to them by Pedro and Alfonso, including the unequivocal statement by Pedro that he had been the victim of child sex trafficking.

344.    Mortensen and Rasmussen breached their duty of care by making the aforementioned statements during the El Universal interview.

345.    Mortensen and Rasmussen's breach of duty to Pedro and Alfonso was the actual and proximate cause of significant damages, including, without limitation, economic damages, including loss of their business and lost wages due to the inability to work, general damages, damage to reputation, and severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in favor of Plaintiffs and against Defendants as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For punitive damages arising from Defendants' willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs;

3. For a preliminary and permanent injunction enjoining Defendants' further defamation of Pedro and public disclosure of Plaintiffs' private facts;

4. For pre-and post-judgment interest as provided by law;

5. For reasonable attorney fees and costs incurred, both before and after judgment;

For such other relief as the Court deems just and equitable.

Dated January 23, 2025.                          HEATON LAW GROUP

                                                 /s/ Timothy T. Heaton
                                                 Timothy T. Heaton
                                                 Daniel D. Heaton
                                                 *Attorneys for Plaintiffs*